The last case of the morning is in re Charles H and for the appellant is Ms. Spahn and for the appellee Ms. Brooks and Mr. Hazzock, are you both going to argue? Have you split your time and advised the clerk? Yes. All right. Thank you. You may proceed. May I please the court? My name is Laurel Spahn. I am an attorney with the Illinois Guardianship and Advocacy Commission's Legal Advocacy Service and we are court appointed as counsel on appeal for Mr. Charles H. There is a simple and straightforward way to deal with this case. That would be to vacate the commitment pursuant to Torski C because the commitment was based on the unconstitutional, quote, dangerous conduct, unquote, standard. A standard that was first found unconstitutional by the Torski C case and the legislature has since repealed that standard. The second district just did the same thing with a similar case. I think the Merrilee M case, which this court allowed me to cite as additional authority, and the Charles H case are the last two Torski C type of cases that were in the appellate courts. So I think Charles H is now the last one, the last one that I know of. And in the Merrilee M case, the second district vacated the commitment. The court based the vacation of the Merrilee M commitment on Torski C and said that it would, it cannot stand. The commitment based on commitment standard declared unconstitutional since repealed cannot stand. In the event that this court feels that the commitment cannot be dealt with in that manner, I would just like to mention that if Charles H had been properly committed, there still remains the issue of the 3-810 dispositional report and his right to treatment in the least restrictive setting. And I would just ask the court to consider that there was a very cursory form treatment plan that was filed, that there was no social assessment, there was no report on the appropriateness and availability of alternatives. And where there is no evidence like that, the recourse is to reverse. I'd also like to point out that this court has always been a big advocate of written information on medication cases. And similar to the written information that must be provided in a medication case, it is the written information that must be provided to the trial court for purposes of disposition. So a copy of what was filed as the disposition report is included in the appendix to the opening brief. It's, I think, three pages all together. And one of those pages is just all of the treatment team's names and signatures. Even the treatment plan portion of the disposition report doesn't provide any information on the respondent's treatment needs and problems and how those are going to be addressed. Finally, I would just like to point out that there were some questions about mootness. I think those have been resolved based on the pre-oral argument state's motion to dismiss the case as moot. The court had asked for a response from Charles H. And we included in that response to the motion to dismiss that there are no other commitment orders besides this one for Charles H. There had been one other admission that was handled by my colleague downstate, Barbara Gobin. But that case was dismissed and Mr. H. was discharged. So there are no other orders which would mean the collateral consequences exception to mootness is appropriate to apply here. And if there are no questions, I have nothing further. Well, this may not be exactly a question. It's somewhat of a commentary, but I think it identifies some structural weaknesses in our system. Sangamon County has now become a catchment venue for 58 counties in the state of Illinois. Between the two hospitals and the zone center, that is the volume of work with no corresponding increase in staff or medical personnel to deal with that volume of work. That seems to be a problem. And we get a lot of these cases, as you probably know. I doubt that a month goes by that we do not have two or three appeals from commitment proceedings. It's a structural problem. And I don't know what to do about it. If you would like a comment from me about that, I'd be happy to respond. I think part of the problem with the appeals is a different approach to the trial work than in other parts of the state. I can tell you that in Cook County, where I have a trial practice also, we have... I'm trying to count the attorneys we have. We each have a day of the week, but on one day, because of both a state-operated facility and multiple private hospitals, we have two attorneys that day. So there are six attorneys handling defense work in Cook County for approximately 3,500 to 4,000 cases a year. And we have a very intentional approach to our practice. We file motions to dismiss, motions for more definite and certain pleadings, motions for judgment on the pleadings. We work with our clients... How many hearings a day? I think that depends. I don't know how... I can't do that math that fast in my head to divide how many cases in a week. But a lot of the cases end up being resolved. They are... My point is that Judge Sanchez will start at 8 in the morning and go to the two hospitals and the Zone Center, and in the course of a very long day, have 30-plus cases. We may have that many cases on each court call a day, but we may only have a few that actually go to trial. And that's... I think that's because of time spent with the clients, time spent behind the scenes working with the treatment team, talking with the witnesses, talking with family members involved, looking to see if there are alternatives, looking to see if people want to do agreed outpatient orders. A lot of times when the respondents feel that they are getting all the respect and process that they're entitled to, I think that we're willing to work within the system. And frankly, we have some doctors who work very well with patients. And when we see a case, an involuntary case filed with that doctor involved, we know that is a very serious case because that doctor usually works very well, is able to persuade the recipient to stay as a voluntary. A lot of times a respondent may be willing to continue the case for a week because there's going to be a discharge or there's going to be an alternative placement in the works. And I think maybe what would be a really helpful thing to happen is for our office to maybe share some of what we do with the state's attorney, and for the state's attorney as well. The state's attorney and the defense counsel to share some of those ideas with the state's attorney and the defense counsel in San Juan County. I know that our director has made an offer by letter in response to one of this court's opinions saying that needs to happen. And it has not happened yet. But the offer has been made. And unfortunately, there used to be a guardianship and advocacy, legal advocacy service attorney serving the Springfield area. And when that person left, the position was never filled and was never funded again. We would very much like to have another legal advocacy service attorney to be able to serve respondents in this area. As a practical matter, we've got a one-day-a-week part-time public defender. And that's it. And that's all the money there is. I think if maybe some ideas are shared, and to the public defender's credit, I think there have been some different ones lately. But we had been dealing with one person for a period of time, and that public defender would contact us or email us for suggestions in cases from time to time. And we would share information. But I don't think that the caseload is necessarily overwhelming here. It probably compares a lot to what one person has in Cook County. But not every case can go to trial. If we're having eight trials in a day, we're not doing a good job. I can tell you that most of my colleagues and I, you know, we don't have a lot of time. We don't know how we could get through everything we need to cover in less than an hour and a half. A lot of times our trials are going longer than that. But an hour and a half is a good amount of time that we will devote. When we have trials in Cook County, except for Chicago Reed Mental Health Center, Madden Mental Health Center, and Tinley Park Mental Health Center, the three state operated facilities, trials happen there. We have regular courtrooms there. But now trials are also happening at the private hospitals. And when the judges are scheduling trials, when we have multiple trials on a given day, they're allotting about two hours per trial. So those are some of my thoughts on this. It sounds daunting, but I think there are ways to manage and to look at this, look at this caseload, and to provide therapeutic jurisprudence to these recipients, to these mental health respondents. And that makes a big difference. Well, I appreciate that, and I hope you will communicate the concerns we have to your superiors. I certainly will. Thank you. And I would ask for Lee to come up again for rebuttal. Oh, you have that right, yes. Mr. Huzzah, you're going first. May it please the court, I'm Richard Huzzah, Assistant Attorney General Counsel for Interventor Lisa Madigan, Attorney General Interventor with respect to the constitutional issues in this case. And I have the enviable task of urging to this court that the Torsky decision did not address, but had to address, two issues that are relevant to the disposition of this case involving the same or similar statutory provisions. And those questions are whether, as applied constitutionally, the statute should have been the mode of analysis rather than facial constitutionality. And second, whether the statute is susceptible to a reasonable limiting construction that would avoid the constitutional problem, either on a facial or as applied basis. And we respectfully submit that the carefully considered opinion of Torsky did not specifically address these two issues, and that they should be addressed. And we urge resolve consistent with precedent of the Illinois Supreme Court in such a manner as to avoid the ultimate conclusion that the statute, because of some uncertainty in its application in some circumstances, is wholly void and so cannot be applied in a constitutionally valid manner in any circumstances. I wanted to ask you a question. I was kind of surprised that the Attorney General wanted to intervene in this case, in light of the fact that the legislature, after Torsky issued, saw fit to change the statute. Doesn't that suggest to you that they agreed with this court that the statute was unconstitutional? I don't know what the legislative thinking was. They certainly had the problem that this court had declared a statute void and so inapplicable to anybody. It rendered it quite difficult to pursue any commitment proceedings against anybody. I'm talking about the idea of legislative thinking. Right. Well, legislative intent is sort of an illusory concept in the best of circumstances, but I suppose it's sometimes about the length of the Chancellor's foot. It's not entirely in the eye of the holder, but it's subject to some variation. To me, my experience here is that it's pretty rare that the legislature acts so quickly. It's rare that an appellate court strikes down a statute as unconstitutionally vague on its face and therefore inapplicable to anybody. And as Justice Appleton pointed out, the mental health problems and the involuntary commitment problems in our society are ones that won't go away. And the availability of sufficient resources to deal with those in a way that respects the statutory and constitutional process that's fair to both the state's concerns and the respondents' concerns. That's a systemic problem that people grapple with, and I can't say that enough resources have been devoted to that. But nonetheless, given the magnitude of that problem, to have a situation where no commitment proceedings can go forward under the key provisions of the commitment statute created a crisis that needed to be addressed. But why isn't it moot now? Well, this case isn't moot because of the collateral consequences section. No, no, I'm saying why isn't your whole argument about the constitutionality of the Mental Health Act and Torsky moot since the legislature changed the statute? The Torsky case continues to be cited as precedent for not only cases that are brought under the former statute, and I disagree that this is the last one in the appellate court pipeline, there are others, but also it stands for precedent that facial vagueness grounds to invalidate a statute may be resorted to in circumstances where we submit, and as applied analysis, is required under applicable constitutional doctrine, and also where a permissible limited construction of the statute should be adopted. The case does not address either of those issues, and it has been cited against the Attorney General in other circumstances where people would say, oh, imagine this circumstance where this statute could be unclear or potentially invade constitutionally protected conduct, that's not my case, those aren't my facts, but because of that possibility the whole thing goes down and so it can't be applied to me and it can't be applied to anyone. We have an institutional responsibility to defend within the limits of the law the constitutionality of statutes, and there's a hierarchy of principles we apply. The Illinois Supreme Court dismissed the PLA in Torski because of the change in the statute. And because there were no collateral consequences, meaning that the outcome of that appeal would not have had any impact upon the decision in that case. Didn't the Supreme Court say it was moot because of the change in the legislation? It was moot, but there was no mootness exception. I don't know that they actually said anything other than that they granted a mootness motion that we won't dispute, but it was, you know, it was undisputed in that case that there was not a mootness exception that avoided rendering that case sort of academic or biased. And I could be wrong, but my recollection was that because the statute changed, that's why the PLA was dismissed as moot. Not because of the facts of the case being some exception to the mootness doctrine or no exception applying, but the fact that the legislation, in the meantime, by the time we finished Torski, and it got to the Supreme Court, the legislature had already changed the statute. That's true, but that's only part of the analysis, and the extra part of the analysis is that there was a question as to whether there was any mootness exception applicable. In that case, there was none, and so there was no basis, according to the court, to continue to consider the case. But if collateral consequences do apply, and I think it's conceded in this case that they do because this is the first involuntary commitment adjudication, then we have a live controversy. The change in the statute for subsequent commitments by other people in other cases doesn't take away that collateral consequences exception to mootness for which the determination of the validity of this commitment proceeding in this case is a live controversy under the Alfred H. H. decision. I think we're missing each other because my point is that once the statute was changed to comport with constitutional requirements, the Supreme Court decided they wouldn't hear arguments in Torski. Yes. And so why isn't that true in any case that comes up under the old language? In other words, this court found the statute to be unconstitutional. It's the same statute that we have before us in this case. The Supreme Court decided to deny PLA or dismiss the PLA once the statute was changed by the legislature. We may be, you know, ships passing in the night here, and what I'd like to do to try to explain my position is to use an analogy if that might be helpful. If there were a criminal statute where somebody were convicted under that statute and they were challenged to the constitutionality of that statute, and subsequently after the acts that gave rise to that conviction, the legislature changed the statute to eliminate an alleged constitutional infirmity in that statute, that would render constitutional attacks on the prior statute irrelevant to future cases. But there was a separate issue as to whether it would have rendered new challenges to the constitutionality of that criminal statute in cases preceding the amendment. And if, in fact, in the first case the person had collateral consequences attached to that criminal conviction, which are the court would have to decide it. And Torsky was different from that situation because there were no collateral consequences that preserved the live controversy of determining the validity of the adjudication under the former statute whose constitutionality had been questioned. So Torsky was moved without collateral consequences, hence the dismissal of the PLA in that case. This is a case in which there are collateral consequences and necessarily the court, we believe, needs to address, absent the finding of forfeiture, which we've also argued, needs to address the underlying constitutional attack on the statute. We urge the court to conclude that the constitutional arguments do not comport with established doctrine with respect to of a limiting construction that avoids a finding of unconstitutionality either on its face or as a plot. I've presented these arguments, I think, relatively completely in our brief. We understand that it is not an easy thing to do. In fact, this is in my many years of practice. This is the first time I've been in a situation where I'm in today, which is standing in front of a court that issued its decision and respectfully saying, your honors, we think you got it wrong. And we think you got it wrong for these reasons. And we'd urge the court to address those two issues, which because of the lack of mootness disposition, it should address. And we urge them not only to address them, but to rule in our favor. To find that facial unconstitutionality is limited to a very narrow range of circumstances. Those are First Amendment cases or essentially where there is no substantially valid scope of the statute to which it could be applied. We suggest that this is not a statute to which that principle would apply. And that principle works in tandem with the responsibility to give a limiting permissible construction to a statute where there's possible. Now, the other side with respect to the statutory construction issue has essentially taken the position that the, and I'm reading from page 13 of their brief, that the amendments that they challenge, they're the basis for the commitment in this case, provides for commitment without requiring that the person be dangerous. That's not what the statute says at all. The statute refers to danger, a threatening conduct, and a reasonable risk of harm. We concede that in the prior version of the statute, there was more specificity, that it did refer to a risk of serious physical harm in the near future to the respondent or to somebody else, and that in the revision of the statute, not just striking out that language, but a substantial revision of the statute that was, as the legislative history shows, not intended to eliminate dangerousness, but intended to avoid the slippery slope problem in which a person on the slope towards the triggering events of being a danger to himself, herself, or others, was not able to get the benefit of intervention, and then it would be too late, and the avoidable consequences were unavoidable. That's the thrust of the legislative initiative. That's what the legislative history shows. The group behind this was NAMI. Their materials that they circulated, to the extent those can be considered, are consistent with that. Opposing counsel cites some proposition on the website of some unrelated organization, the Treatment Advocacy Center, that says, we've eliminated the concept of dangerousness. They had nothing to do with the statute. Their spin on what the statute means is inconsistent with the language of it. It's inconsistent with the legislative history. I don't know where they came from or what authority they have to propound on what the legislative intent was, but they're wrong. And our position is that, based upon the language of the statute, it is permissible to construe it in a constitutional fashion, and certainly in a fashion that would avoid a finding of facial unconstitutionality, where the relevant test is not, can you imagine some circumstances in which its application becomes difficult, where you border on the edge of what's constitutionally permissible, or otherwise it's uncertain, but there is no standard at all. It's utterly standardless. That is a fallback test for void for vagueness doctrine. The United States Supreme Court in the Morales case said as much. But that's a very, very narrow situation, and it's left for those types of statutes, which essentially say, we're going to leave it to the enforcement officials to decide, on their arbitrary whims, whether they determine that somebody meets the statute or not. And I would submit that when we have a statute that refers to dangerous conduct, threatening conduct, the reasonable risk of harm, that it is not utterly standardless. And if the court needs to find that it would be unconstitutional as applied to the types of situations that involve minimal or trivial emotional or financial harm, that's one thing. But to strike it down its entirety as unconstitutional as to every situation we submit is not warranted under the applicable precedent. The court shouldn't push to find situations in which it may or arguably be unconstitutional that are not presented on the facts of a given case, and then use those to strike down the entire statute. Rather, the presumptions move all in the opposite direction. The court should seek to limit the statute, reasonably possible, find a substantial legitimate scope for its application, and if so, conclude that it cannot be facially unconstitutional. Unless the court has additional questions, I truly appreciate your time and consideration of these difficult constitutional questions. Don't be nervous about telling us that we may be wrong. You can take it. I love coming before this court. I truly appreciate it. It's been one of the most gratifying experiences of my life. And if I were in a situation where I felt that there was not merely tough questioning, but personal hostility, I would have put on a bulletproof vest this morning. And here I am, you know, just another advocate in front of you. And again, I thank you for your consideration. Thank you. Ms. Brooks. May I please the court and counsel, my name is Anastasia Brooks. I represent the people as well. In the remaining minutes, I do want to kind of highlight some of the points. The fact that we are re-arguing sort of Torsky C in a way, although it is a separate subsection, but highly similar. In order to preserve arguments, because the fact that Torsky was not able to be argued on the merits in the Illinois Supreme Court, initial step of the analysis, we would like to emphasize the need to construe the statutes. And here, for example, the statute refers to harm, but yet we need to then look at, for example, since it's not statutorily defined, a dictionary definition, such as the Merriam-Webster one in the state's brief, referring to physical or mental damage, injury. So this is not a statute that's going to apply to merely annoying or innocuous behavior. And also precedents such as CE, which upheld as not being vague the word threatening behavior in a different context, and the Hayward decision referred to force, but here it can be applied to harm to show that we shouldn't throw common sense out the window. And CE referred to the understanding by professionals element of that case. But in Hayward, they applied common sense and said the legislature didn't intend a meaning so broad that it can include all conceivable notions of the word. So here we have this situation where the facts do demonstrate actual dangerousness and would not be unconstitutional as applied. The loud and intrusive threatening demands, wipe smirks off face and do something, as belligerent conduct invading the personal spaces of others. This is not innocuous or merely annoying. So the other thing we'd like to emphasize is something I learned in law school, the keep reading rule, which is the fact that even if the section 1-119 standard referring to persons subject to involuntary admission could apply to people who are not dangerous. However, section 3-811 requires, it sort of qualifies that standard because it says hospitalization is authorized only where appropriate. It has to be the least restrictive alternative for treatment. So therefore, under the entire scheme in the state cited Florida case, this is not going to end up applying to people who are not dangerous enough to be hospitalized. So for that reason, the entire statutory scheme should be analyzed for under those reasons, should be upheld, even under this court's Tversky C analysis for facial validity. There's no over-breath First Amendment concerns here, so it should be litigated on a fact-specific case, case-by-case basis. With respect to least restrictive dispositional court issue, the argument here is sort of different from the ones raised in the cases cited by the respondents brief. This is where they claim that the dispositional report is only incomplete. And of course, there's also testimony to fill in the gaps. And so there's no authority in this court to be the first to hold that an incomplete written report in this context would be per se reversible error, even if it were not objected to below, and even if oral testimony filled in the gaps. So that would be something that the state suggests should follow the previous authority cited by the L.A. Supreme Court, the case was Robinson, instead of the other ones cited by the respondent. So Darrell C was a case in which there was no attempts to even come close with oral testimony to meet the requirements of the statute, as well as Laura H was a decision referring to information, written information that had been given to patients. And here it's not information given to patients for them to decide what to do about medication decisions, because this court had recognized in Laura H that patients don't always talk to the doctors. So that's why written information is required there. The written report is not as needed in this context. And Joseph H was a medication decision referring to bootstrapping, and alleging that respondent will be dangerous unless medicated. But that's not a rule that says that presently dangerous individuals, like Charles H was at the time, should be allowed to basically keep themselves out of a hospital by deciding to refuse medication. And the respondent suggested he has the capacity to refuse medication, so therefore we couldn't even bring an involuntary medication petition against him. So the medication issue is actually a red herring, and the commitment was justified based on his present dangerousness, as described in the facts of the case. And I'm open to questions if you have any. I don't believe so. Okay, we request this court to affirm, and I thank you for your time. Thank you. Rebuttal? Yes. It's always sort of a disappointment to me, as an advocate for persons with mental illness and mental disabilities, that the Attorney General is on the opposite side of that argument. That the state is on the opposite side of that argument. Well, especially with the Attorney General's website, which highlights the rights of persons with disabilities. And as the Attorney General's representative conceded, the prior statute talked about physical harm. The revised statute, the post-Torski-See Commitment Standard, physical harm. So we are back to including that concept of there has to be a particularly high level of harm that warrants taking away a person's individual freedom. So I wanted to make that point, that we do feel that Torski-See was correct. We do feel that the legislature acted because of this court's Torski-See decision, and wanted to have a correct commitment standard that did comport with constitutional requirements. I think it's interesting, too, that the state and the Attorney General are still arguing the substance of Torski when the state moved to dismiss this case's moot, saying that a public interest exception no longer applies to that. I don't think we're here today to re-argue Torski, but there is a question of law. Do we just apply Torski? Can the Torski decision apply, like in Merrilee M., to vacate this commitment? I would like to point out the Felczak case, F-E-L-Z-A-K, that's cited in Mr. H.'s reply brief, which talks about when there is a change to the statute, there is no longer a need to delve into that statute. So as far as revisiting the substance of Torski, that is moot because of the change in the legislature. Whether to apply the Torski-C decision to this case is a question of law. I don't think that is moot. I think because of the collateral consequences to Charles H. if this decision stands. One way or another, this case ought to be decided on the merits, either addressing the unconstitutional standard in applying Torski and vacating the commitment because the commitment was based on an unconstitutional standard, or whether it's based on the problems with the disposition. But I think this court could avoid the question of the disposition and just vacate, the same way the 2nd District did at the end of April in the Merrilee M. case. And I would also just like to close with the whole concept of harm here. The state's attorney spoke with you about invading the personal space of others. Charles H. came to Springfield at the recommendation, he says, of his Alton doctors to get better health care. He came up here, he was in the emergency room, he was questioned, have you ever had mental health treatment? And he said, well yes, I do have a diagnosis of mental illness. I'm in a period of recovery right now. But he was admitted to a mental health unit. He waved papers around. He said, I want to be discharged. He was loud. That's exactly the type of situation that this court's decision in Torski was meant to prevent. Charles H. was loud, waved papers. He was asserting his right to be free from hospitalization. That does not warrant involuntary hospitalization. Thank you. We would ask that you either reverse the Charles H. commitment, vacate it, or vacate it according to Torski's C, as the second district did in Merrilee Alley. And if there are no other questions, I would just thank the court. Thank you, counsel. We'll stand in recess until 12 o'clock.